# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>SAN DIEGO GAS & ELECTRIC COMPANY, et al.,<br><br>    Defendants. | CASE NO. 06 CR 0065 DMS<br><br>**ORDER GRANTING MOTION TO DISMISS COUNTS 1, 2, 3 AND 5 OF THE INDICTMENT FOR FAILURE TO STATE AN OFFENSE INVOLVING JURISDICTIONAL AMOUNT OF "REGULATED" ASBESTOS-CONTAINING MATERIAL** |

Defendants move to dismiss four counts of the Indictment for failure to state an offense. At issue are the Government's allegations regarding "work practice" violations, stemming from Defendants' removal of asbestos containing materials. Because the work practice standards apply only to "regulated" asbestos containing material, and the Indictment does not charge the essential elements of such an offense, it must be dismissed.

## I.
## BACKGROUND

On January 11, 2006, a federal grand jury returned the Indictment in this case. The Indictment stems from San Diego Gas & Electric Company's ("SDG&E") removal of asbestos pipe coating material from an underground pipeline allegedly in violation of work practice standards promulgated

by the Environmental Protection Agency ("EPA"). SDG&E owned a sixteen acre parcel of land at 1350 San Altos Place in Lemon Grove, an area known as the Encanto Property. The Encanto Gas Holder Facility was located on the Property. The facility is a former natural gas storage and delivery facility comprised primarily of a compressor station and 9.23 miles of underground gas pipeline. In June 1999, SDG&E entered into a tentative agreement to sell the Property to a developer. The sale required SDG&E to demolish the Encanto Facility and remove the underground pipeline. The pipe, comprising the pipeline, was wrapped in coal tar insulation ("pipe wrap") that contained six discrete layers of material, one or more of which contained asbestos. The removal of the pipeline began in September 2000, and was completed by early 2001.

Defendant Kyle Rheubottom served as project superintendent of the general contractor hired by SDG&E to demolish the Encanto Facility. Defendants Jacquelyn Mc Hugh and David Joseph Williamson are SDG&E employees who oversaw the demolition project.

Both the County, through the San Diego County Air Pollution Control District ("APCD") and the San Diego County Department of Environmental Health ("DEH"), and the United States investigated the Encanto demolition. On August 30, 2005, the County filed a civil lawsuit on behalf of the APCD and DEH alleging that Defendants violated the asbestos work practice standards during the removal of the pipeline. The County dismissed the lawsuit seven months later, after the United States returned the Indictment in this case.

**A. Regulated Asbestos Containing Material ("RACM")**

The regulatory scheme promulgated by the EPA subjects the removal of certain "asbestos containing materials," known as "ACM," to environmental oversight and regulation. Not all materials containing asbestos, and not all demolition projects, are regulated. To be "regulated," the material and project must exceed certain thresholds regarding project size and asbestos content. Three conditions must exist: <u>First</u>, the amount of ACM to be removed must exceed (i) 260 linear feet on pipes, (ii) 160 square feet on other facility components, or (iii) 35 cubic feet where length or area cannot be measured (40 C.F.R. § 61.145(a)); <u>Second</u>, the quantity of asbestos fibers in the material must exceed 1% as determined by a "specified" test method (40 C.F.R. § 61.141); and <u>Third</u>, the ACM must be "friable," that is, it may be crumbled by hand pressure creating dust, or if initially "nonfriable," the ACM must

be (i) "Category I" ACM that has become friable, (ii) Category I ACM that will be or has been subjected to certain acts of disturbance during the removal process (*e.g.,* sanding, grading, cutting, or abrading), or (iii) "Category II" ACM that has a "high probability" of becoming friable due to acts of disturbance during the removal process. (*Id.*) The EPA desires to regulate asbestos that is friable or may become friable because asbestos fibers may be released when asbestos is in a friable state, possibly causing incurable and fatal lung diseases to those who inhale such fibers.

Accordingly, if the asbestos content is greater than 1% as determined by the specified test, and the ACM is friable or of a qualifying nonfriable nature, then the material is deemed to be "Regulated Asbestos Containing Material," or "RACM." Further, if the project quantity threshold is met (*e.g.,* over 260 linear feet of pipe) and the material is RACM, then the demolition project is subject to the asbestos work practice standards.

**B. The Indictment**

The Government contends Defendants knew the asbestos work practice standards applied to the demolition of the Encanto Facility, but nonetheless engaged in a coverup and knowingly failed to observe applicable work practice standards. The Indictment charges Defendants with five counts, four of which allege violations of work practice standards during the removal of alleged RACM.[1]

The work practice counts allege Defendants conspired to violate the work practice standards, failed to provide written notice to the EPA before removing the RACM, failed to adequately wet the RACM during removal, and failed to place the RACM in leak-tight wrapping. Specifically, Count 1 alleges Defendants knowingly conspired to "violate the asbestos work practices; in violation of Title 42, United States Code, Sections 7412 and 7413(c)(1)." (Indictment at 3.) It further alleges Defendants "agreed [among themselves] that when communicating with government inspectors . . . they would describe the coating removed from the underground piping as not federally regulated asbestos containing material [RACM]." (*Id.*) Count 2 alleges Defendants "failed to provide advance written notice to the U.S. Environmental Protection Agency . . . of the removal of over 260 linear feet of regulated asbestos containing material [RACM], as required by 40 C.F.R. Section 61.145(b)."

---

[1] Count Four of the Indictment alleges false statement under Title 18 U.S.C. § 1001, against Defendants SDG&E and David Williamson. Defendants' motion to dismiss the false statement count is addressed in a separate order.

(Indictment at 6.)  Count 3 alleges Defendants "failed to adequately wet the regulated asbestos containing material (RACM) during removal, as required by 40 C.F.R. Section 61.145(b)." (Indictment at 6.)  Count 5 alleges Defendants "failed to contain the regulated asbestos containing material (RACM) in a leak-tight wrapping, as required by 40 C.F.R. Section 61.145(c)." (Indictment at 7.)

The Indictment alleges only one of the three conditions relating to project size and asbestos content, specifically, that Defendants were "owner[s] or operators of an asbestos demolition operation involving over 260 linear feet" of pipe. It does not allege the elements of RACM. Rather, it simply charges that the material is "regulated asbestos containing material (RACM)."

### C. The Bill of Particulars

Defendants moved for a bill of particulars on August 11, 2006. The Court granted the motion and ordered a bill of particulars regarding the category of ACM involved and whether the asbestos was regulated on the pipe or as a result of the method of removal. On September 8, 2006, the Government filed its bill of particulars, stating its "now . . . official position" is that the pipe wrap is Category II ACM, although it concedes that at various earlier times county inspectors had taken the position that the material was Category I. (Bill of Particulars at 5.) Some inspectors initially thought the pipe wrap was Category I ACM, but later concluded "it could be Category II or a combination" of both. (*Id*.) Regardless, the bill of particulars makes clear that the pipe wrap contained multiple layers of material and was tested for asbestos under the following method:

> If a material believed to contain asbestos consists of several distinct and dissimilar layers, each layer must be separately analyzed for its asbestos content. *If any of the layers, standing alone, meets the definition of regulated asbestos containing material (i.e., over 1% asbestos and friable), then the entire material is deemed to be regulated asbestos containing material, and the NESHAP work practice standards are applicable to the project*. Similarly, if nonfriable asbestos containing material is mixed with friable asbestos containing material, the resulting mixture must be treated as friable asbestos containing material.

(Bill of Particulars at 9) (emphasis added) (citations omitted). Accordingly, under the Government's test method and present theory of prosecution, if *any* layer of the pipe wrap contained more than 1% asbestos and the asbestos was friable or had a high probability of becoming friable due to acts of disturbance during the removal process, the pipe wrap would be deemed RACM and its removal

would be subject to the work practice standards.

**D. Grounds for Dismissal**

Defendants seek dismissal on two grounds: (1) "[t]he Indictment fails to state an offense, as a matter of law, because it does not satisfy the jurisdictional predicate of demonstrating that the Encanto pipe coating material contains" more than 1% asbestos; and (2) the Government cannot "belatedly cure this jurisdictional defect" because it did not use the test method required by law and "no intact multi-layered material remains," thus depriving Defendants of due process and "the ability to vindicate themselves using the only scientific test method authorized by law to demonstrate that their conduct is lawful." (Motion to Dismiss at 2-3.) The Government disputes the Indictment is defective, asserting it adequately "tracks the language of the statute . . . ." (Response at 45.) The Government further contends that while it did not use the test method cited by Defendants, there is no due process violation, as sufficient samples exist from which Defendants (and the Government) can – under any applicable test method – determine if the pipe wrap contains over 1% asbestos.[2]

## II.

## LEGAL STANDARD

Federal Rule of Criminal Procedure 12(b) provides: "Any defense, objection, or request which is capable of determination without a trial of the general issue may be raised before trial by motion." Fed. R. Crim. P. 12(b). "In ruling on a pre-trial motion to dismiss an indictment for failure to state an offense, the district court is bound by the four corners of the indictment." *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002) (citations omitted). The court "should not consider evidence not appearing on the face of the indictment." *Id.*

An indictment must contain a "plain, concise and definite written statement of the essential facts constituting the offense charged." Fed.R.Crim.P. 7(c)(1). An indictment also "must set forth the elements of the offense charged and contain a statement of the facts and circumstances that will inform the accused of the elements of the specific offense." *United States v. Fitzgerald,* 882 F.2d 397, 399 (9th Cir. 1989) (citing *United States v. Martin*, 783 F.2d 1449, 1452 (9th Cir. 1986). Under Rule

---

[2] Because the Court finds, as developed below, that the Indictment is fatally flawed for failing to allege all essential elements of the offenses charged, the Court declines to address Defendants' due process arguments.

12(b)(2), a court is authorized to dismiss "an indictment if its allegations do not suffice to charge an offense," but not if it merely fails to contain sufficient evidence "to prove the indictment's charges." *United States v. DeLaurentis*, 230 F.3d 659, 660-61 (3rd Cir. 2001) (reversing dismissal where indictment "substantially track[ed] the language of the statute") (citing *United States v. Sampson*, 371 U.S. 75, 78-79 (1962)). "[I]f properly challenged prior to trial, an indictment's complete failure to recite an essential element of the charged offense is not a minor or technical flaw subject to harmless error analysis, but a fatal flaw requiring dismissal of the indictment." *United States v. Omer*, 395 F.3d 1087, 1088 (9th Cir. 2005).

## III.

## DISCUSSION

To sufficiently charge a violation of the work practice standards, the Government must allege, among other things, facts regarding project size and RACM. Applied to this case, the Government must allege: (1) the pipeline is of a certain size (*i.e.*, at least 260 linear feet) (40 C.F.R. § 61.145 (1)); (2) the pipe wrap contains ACM that is more than 1% asbestos as determined by a specified test method (40 C.F.R. § 61.141); and (3) the ACM is friable or Category I or II nonfriable ACM. (*Id*). Defendants' motion focuses on the issue whether the Government's failure to allege that the pipe wrap contains more than 1% asbestos as determined by a specified test is a defect that warrants dismissal. Defendants also argue in a related motion that the Government's "internally inconsistent positions" regarding the nature of ACM involved warrants dismissal.[3] Because Defendants challenge the sufficiency of the Indictment in the present motion, both elements of RACM are addressed in this Order.

### A. First Element of RACM: More than 1% Asbestos as Determined by Specified Test Method

In concluding that the pipe wrap meets the 1% threshold amount, Defendants argue the Government relied on an improper test method to test bulk or multi-layered materials, one that was

---

[3] *See* Motion to Dismiss Counts 1, 2, 3 and 5 of the Indictment on Due Process Grounds (Internally Inconsistent Government Positions Re Nature of ACM) (Doc. No. 159). Defendants filed that motion and eight other substantive motions, including the present motion, on the same date. All of the motions were heard on October 27, 2006. In this Order, the Court addresses only the issue whether the Indictment fails to allege essential elements, as this issue is dispositive. The remaining motions, except as noted in footnote 1, *supra*, are denied as moot.

never properly enacted by the EPA. As set out in the bill of particulars, under the test method employed by the Government, each of the six layers of the pipe wrap was analyzed, and if *any* layer included more than 1% asbestos, the entire system was deemed to be regulated. (Bill of Particulars at 9.) This Order refers to the Government's test method as the "single-layer" test method.

According to Defendants, the correct test method – the one the EPA sought to replace with the single-layer method – requires the Government first to calculate the asbestos content of each layer, and then to *average* the results to determine the quantity of asbestos for the whole system. The whole system is regulated only if the average exceeds 1 percent. This Order refers to this test method as the "averaging" test method.

Defendants argue the Government's reliance on the wrong test method requires dismissal of the work practice counts. Defendants maintain the test method used by the Government – the single-layer method – is improper because the EPA failed to follow the rulemaking procedures set out in the Administrative Procedures Act ("APA") when promulgating that test method. According to Defendants, until and unless the EPA complies with rulemaking procedures, the single-layer method is not binding and cannot be used to support a criminal prosecution. In other words, a criminal prosecution for violation of work practice standards must be based on the averaging test method where, as here, multiple layers of ACM are involved. The Government disagrees, asserting the EPA need not have complied with rulemaking procedures because the single-layer test method is merely a "clarification" of the averaging test method.

A review of the history of the regulation at issue and the rulemaking requirements of the APA is helpful to determining whether the single-layer test method is subject to the APA's rulemaking requirements. If it is, it is not binding and does not replace the original (averaging) test "specified" in the regulation, and the Government must prosecute (and prove to the grand jury) its theory of the case under the averaging test method.

### *1. History of Asbestos NESHAP Regulation*

The Clean Air Act authorizes the EPA to identify and regulate hazardous pollutants. 42 U.S.C. § 7412. Pursuant to § 7412, the EPA enacted the National Emission Standards for Hazardous Air Pollutants ("NESHAP"), setting out permissible emission standards for identified pollutants, one of

1 which is asbestos. The asbestos NESHAP regulation was first promulgated in 1973. *See* 38 Fed. Reg.
2 8826, 8829-30 (Apr. 6, 1973). Among other things, the asbestos NESHAP requires owners and
3 operators of asbestos containing facilities to follow certain procedures (*i.e.,* work practices) when
4 removing regulated asbestos materials. 40 C.F.R. Part 61, Subpart M, section 61.145. Violation of
5 NESHAP work practices constitutes a violation of the Clean Air Act. 42 U.S.C. § 7412(c) & (e).
6 Since 1973, the asbestos NESHAP has been amended several times, in 1975, 1984, 1990 and 1994.

7 Although the 1973 NESHAP regulation sets out the basic framework, it remained quite
8 undeveloped until 1990 when the EPA adhered to APA rulemaking requirements and made substantial
9 changes to the NESHAP regulation. Among other things, the 1990 NESHAP amendments classified
10 nonfriable asbestos as either Category I or Category II asbestos-containing materials. 55 Fed. Reg.
11 48406, 48409 (Nov. 20, 1990). In addition, the amendments replaced the weight-based standard to
12 determine asbestos quantity in materials (1% by weight) with a two-dimensional area-based standard
13 (1% by area). 55 Fed. Reg. 48406, 48410 (Nov. 20, 1990). To determine whether a material includes
14 more than 1% asbestos by area, the EPA in its 1990 NESHAP amendments adopted a test method
15 known as Polarized Light Microscopy ("PLM"), which was set forth in and borrowed from the Toxic
16 Substances Control Act ("TSCA") of 1982 and the Asbestos Hazard Emergency Response Act
17 ("AHERA") of 1987. 47 Fed. Reg. 23360, 23376 (May 27, 1982); 52 Fed. Reg. 41836, 41837 (Oct.
18 30, 1987).

19 Specifically, the 1990 NESHAP provides that asbestos containing material is regulated if it
20 contains "more than 1 percent asbestos *as determined using the methods specified in* appendix E,
21 subpart E, 40 C.F.R. part 763, section 1, Polarized Light Microscopy." 40 C.F.R. § 61.141 (emphasis
22 added). With respect to bulk materials, the "specified" test method in the 1990 NESHAP provides for
23 an averaging of the combined layers to determine asbestos content:

> Bulk samples of building materials taken for the identification and quantitation of asbestos are first examined for homogeneity at low magnification with the aid of a stereomicroscope. The core sample may be examined in its container or carefully removed from the container onto a glassine transfer paper or clean glass plate. If possible, note is made of the top and bottom orientation. *When discrete strata are identified, each is treated as a separate material so that fibers are first identified and quantified in that layer only, and then the results for each layer are combined to yield an estimate content for the whole sample.*

40 C.F.R. part 763, section 1 (emphasis added).

In response to the 1990 NESHAP amendments, the EPA received numerous questions regarding bulk material analysis. In 1994, the EPA issued a "clarification" to its (averaging) test method. 59 Fed. Reg. 542 (Jan. 5, 1994). The EPA stated: "when a sample consists of two or more distinct layers or materials, *each layer should be treated separately and the results reported by layer* (discrete stratum)." *Id.* (emphasis added). The EPA's 1994 clarification, however, did not eliminate questions. In 1995, the EPA issued another clarification, explaining: "all multi-layered systems . . . must be analyzed as separate materials, and *the results were not allowed to be combined to determine average asbestos content . . .*" 60 Fed. Reg. 65243 (Dec. 19, 1995) (emphasis added). Defendants argue these "clarifications," resulting in the single layer test method, constitute impermissible rulemaking.

### 2. *The Administrative Procedures Act*

"The APA empowers federal courts to 'hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law . . . .'" *New York State Electric & Gas Corp. v. Saranac Power Partners, L.P.*, 267 F.3d 128, 131 (2nd Cir. 2001) (citations omitted). "The APA creates a statutory scheme for informal or notice-and-comment rulemaking reflecting 'judgment by Congress that the public interest is served by a careful and open review of proposed administrative rules and regulations.'" *Alcatraz v. Block*, 746 F.2d 593, 610 (9th Cir. 1984) (citation omitted). "In most instances, agency 'rules' must be subjected to a notice and comment period before taking effect." *State Electric & Gas Corp.*, 267 F.3d at 131 (citing 5 U.S.C. § 553(c); *Alcatraz*, 764 F.2d at 610-611. "However, the APA excepts rules that are merely interpretive from this general procedure." *State Electric & Gas Corp.*, 267 F.3d at 131; 5 U.S.C. § 553 (d) (A). "[A]n agency may not escape the notice and comment requirements by labeling a major substantive legal addition to a rule a mere interpretation." *Applachian Power Co. v. Environmental Protection Agency*, 208 F.3d 1015, 1024 (D.C. Cir. 2000) (citation omitted).

Generally, a "substantive rule 'has the force of law,' while an interpretive rule is 'merely a clarification or explanation of an existing statute or rule' and is 'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.'" *La Casa Del Convaleciente v. Sullivan*, 965 F.2d 1175, 1178 (1st Cir. 1992). A rule is substantive if it "creates

rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself . . . ." *Dia Navigation Company, Ltd. v. Pomeroy*, 34 F.3d 1255, 1264 (3rd Cir. 1994) (citations omitted). On the other hand, a rule is merely interpretive "if it attempts to clarify an existing rule but does not change existing law, policy, or practice." *Rocky Mountain Helicopters, Inc. v. Federal Aviation Claims*, 971 F.2d 544, 546-7 (10th Cir. 1992). A substantive or legislative rule is subject to the rulemaking requirements of the APA.

### 3. The Promulgation of the "Single-Layer" Method is Legislative in Nature and Subject to the APA's Rulemaking Requirements

The single-layer method, as set out in the 1994 and 1995 clarifications, imposes new obligations on the regulated community by expanding the scope of regulated asbestos containing material. Under the averaging test method, to determine whether a multi-layered material contains more than 1% asbestos, a lab technician must (1) quantify the amount of asbestos fibers in each layer; and then (2) combine the results of each layer to determine "an estimate of asbestos content for the whole sample." The material is not regulated unless the combined result yields more than 1 percent asbestos.

The single-layer test method eliminates the second prong of the test. It provides that the material is regulated if any layer contains more than 1 percent asbestos. This test clearly expands the scope of regulated asbestos containing material because, undoubtedly, some materials previously considered not regulated under the averaging test method would be swept into the regulation under the single-layer test method. The clarifications, therefore, impose new obligations and duties on the regulated community where none existed prior to the amendment.

The EPA itself acknowledged that the two test methods have significant differences. In the 1995 amendments, the EPA explained that its "unwritten policy" regarding analysis of bulk materials has been that "each layer in a multi-layered system would be analyzed as a separate material (no averaging or dilution by combining layers of asbestos-containing material with nonasbestos-containing material was allowed.)" 60 Fed. Reg 65243. The clarifications, therefore, attempt to carry out this unwritten policy without rulemaking procedures.

Moreover, in a Notice of Advisory issued on August 1, 1994, the EPA announced an

"improved test method" for bulk sample analysis for both the AHERA and NESHAP regulations. 59 Fed. Reg. 38970 (Aug. 1, 1994). In addition to introducing new scientific techniques for identifying asbestos fibers, the improved test method required that laboratories "analyze the individual strata or layers and report a single result for each layer." *Id.* Thus, regardless of which scientific technique is used to detect asbestos fibers (PLM or otherwise), laboratories are no longer permitted to average or combine the amount of fibers in each layer to determine the asbestos quantity of the whole system. The EPA explains the previous method for analyzing bulk samples – the averaging test method – is disfavored because "multi-layered samples which may contain asbestos in a single layer may have been reported by laboratories as nonasbestos-containing." *Id.* The averaging test method, therefore, had the effect of diluting the quantity of asbestos present in a system, thereby preventing the application of NESHAP in some instances.

The new test method was intended to address this shortcoming: "a multi-layered sample which previously was determined to be nonasbestos-containing may now have layers which will be classified as asbestos-containing based on the presence of asbestos in greater than 1 percent." 59 Fed. Reg. 38970. It is clear, therefore, that the EPA did not consider the change a mere interpretation. Rather, the EPA's description of the resulting differences between the two tests suggests a substantive change. The Notice of Advisory indicates the impetus behind the change was not to clarify ambiguities; rather, it was to expand the scope of regulated asbestos material.

The Government nevertheless argues the clarifications are merely interpretations of the averaging test method. Citing the key language describing the averaging test method ("When discrete strata are identified, each is treated as a separate material so that fibers are first identified and quantified in that layer only, and then the results for each layer are combined to yield an estimate of asbestos content for the whole sample"), the Government argues that this particular language has been a source of confusion in the regulated community. Specifically, according to the Government, it is unclear "how the first clause and the second clause of the sentence fit together in the regulatory scheme," whether "a value of greater than 1% on both a single strata AND the whole [is] required for NESHAP applicability, or whether a value of greater than 1% under either clause could result in NESHAP applicability." (Response at 47-48) (original emphasis). The Government contends the

1994 and 1995 clarifications were intended to address these ambiguities. Citing *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984), the Government argues the EPA's interpretation is reasonable and, therefore, entitled to deference. (*Id.* at 47-49.)

These arguments are unpersuasive for two reasons. First, even assuming the language of the averaging test method is ambiguous, the clarifications do not address the ambiguities identified by the Government. Nor do the clarifications address any ambiguities that may be read into the statute. Rather, the clarifications have the effect of fashioning a new test method, by discarding the second step of a two-step analysis. Second, even assuming the clarifications constitute an interpretation of an ambiguous regulation, it is unclear whether *Chevron* deference is appropriate in the criminal context. Under *Chevron*, an agency's interpretation of ambiguous statutory language is entitled to deference because of the agency's delegated authority to administer the statute. 467 U.S. 837. The same consideration underlies deference to an agency's interpretation of its own regulation. *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994). Several courts, however, have questioned whether such deference is appropriate in the criminal context. *See United States v. Douglas*, 974 F.2d 1046, 1048, n. 1 (9th Cir. 1992); *United States v. McGoff*, 831 F.2d 1071, 1077 (D.C. Cir. 1987). Having concluded that the clarifications do not address any alleged ambiguity in the underlying regulation, deference is inappropriate under the circumstances in any event.

Finally, the Government argues that under the "credible evidence" rule, set forth at 40 C.F.R. 61.12, it is entitled to use any credible evidence to establish that Defendants committed the crimes charged. (*See* Supplemental Response.) Under this rule, the Government believes it is not limited to a specific test method, but may use any credible evidence to establish a violation. The credible evidence rule, however, is an evidentiary-based rule that assumes a properly alleged indictment. Accordingly, whether the Government can prove at trial that the pipe wrap contains more than 1% asbestos under either the averaging or single-layer test method is irrelevant to whether the defect in the Indictment constitutes a "fatal flaw" requiring dismissal.

The single layer test method is therefore a legislative rule, the promulgation of which requires adherence to rulemaking procedures mandated by the APA. Because the single-layer test method was not subject to such rulemaking procedures, it is not binding and does not replace the earlier

1  promulgated averaging test method. Accordingly, it may not provide the basis for the Government's
2  prosecution. The Government's failure to allege that the pipe wrap contains more than 1% asbestos
3  as determined by the "specified" 1990 NESHAP test method renders the Indictment defective.
4  Moreover, the failure to allege this element illustrates the flaw in the Indictment, as the grand jury
5  never was presented with evidence that the pipe wrap contained more than 1% asbestos as determined
6  by the averaging test method. It is undisputed the Government proceeded under the single-layer test
7  method. Therefore, the grand jury could not have found that the pipe wrap contained more than 1%
8  asbestos under the specified test method.

### B. Second Element of RACM: Category of ACM

The second element of RACM concerns the nature of ACM involved. The NESHAP specifies four categories of RACM: (1) friable asbestos material; (2) Category I nonfriable ACM that has become friable; (3) Category I nonfriable ACM that will be or has been subjected to sanding, grading, cutting, or abrading; and (4) Category II nonfriable ACM that has a "high probability" of becoming friable due to "forces expected to act on the material in the course of demolition or renovation . . . ." 40 C.F.R. § 61.141. Here, the Indictment does not allege the particular category of RACM involved.

An allegation regarding the nature of ACM requires the Government to show, and the grand jury to find, that the material falls within one or more of the four defined categories of RACM. The category of ACM also determines what evidence the Government must present to obtain an indictment. For example, if the material contains friable asbestos, the Government must introduce evidence that the material, "when dry, can be crumbled, pulverized, or reduced to powder by hand pressure." 40 C.F.R. § 61.141. If Category I material is involved, the Government must show that the material has either "become friable," or "will be or has been subjected to sanding, grinding, cutting, or abrading." *Id.* On the other hand, if the material is Category II, the Government must show that the material "has a high probability of becoming or has become crumbled, pulverized, or reduced to powder by the forces expected to act on the material in the course of demolition." *Id.*

"An indictment which specifically states all elements of the offense [] ensures that the grand jury charged such an offense and that critical parts of the charged offense were not subsequently contributed by the prosecutor alone." *United States v. Diecidue*, 603 F.2d 535, 546-7 (5th Cir. 1979).

1  Here, it is unclear whether the grand jury considered evidence regarding any or all of the categories
2  of ACM because the Indictment does not allege this element.

3          **C. The Government's Failure to Allege the Elements of RACM Requires Dismissal**

4          An indictment must allege each essential element of the offense to insure that a defendant does
5  not face punishment for a crime except "on a presentment or indictment of a Grand Jury." *See United*
6  *States v. Vinyard*, 266 F.3d 320, 325 (4th Cir. 2001); *see also* U.S. Const. Amend. V ("No person shall
7  be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment
8  of a Grand Jury . . ."). Therefore, an indictment that fails to allege an essential element of the offense
9  cannot be rescued by a bill of particulars. *Russell v. United States*, 369 U.S. 749, 770 (1962); *United*
10 *States v. Rosi*, 27 F.3d 409, 414 (9th Cir. 1994) ("It is well-settled [] that a bill of particulars cannot
11 cure an otherwise invalid indictment."). This is so because the validity of an indictment depends on
12 whether the grand jury has found probable cause as to each element of the offense. *United States v.*
13 *Hooker*, 841 F.2d 1225, 1227 (4th Cir. 1988).

14         As discussed, to sufficiently charge a violation of the work practice standards, the Indictment
15 must allege not only that the demolition project meets the size threshold (*i.e.,* over 260 linear feet),
16 but also that the asbestos containing material contains more than 1% asbestos as determined by the
17 specified test method and that the material falls within one of four defined categories of RACM. Here,
18 the Indictment fails to allege these elements, let alone facts supporting a conclusion that the pipe wrap
19 is RACM and subject to work practice standards. The Indictment neither discloses the test method
20 relied on by the Government, nor that the pipe wrap actually meets the threshold requirement of more
21 than 1% asbestos. That the Government in fact relied on a test method, other than as specified in the
22 1990 NESHAP, highlights the Indictment's defect. Additionally, the nature of material involved,
23 whether it is friable, or Category I or Category II nonfriable ACM, is not alleged.

24         Defendants argue dismissal is required because the Indictment's deficiency is "jurisdictional"
25 in nature. (Motion at 38.) Although Defendants (and other courts) have characterized the failure to
26 allege an essential element of an offense as "jurisdictional," the Supreme Court has held that "analysis
27 of that issue in terms of 'jurisdiction' [is] mistaken." *United States v. Cotton*, 535 U.S. 625, 631
28 (2002) (citations omitted). The objection that the indictment does not charge a crime goes "to the

merits of the case." *Id.* at 630. (citations omitted). In any event, no matter how the defect is characterized, dismissal is required if an indictment fails to allege an essential element and the defect is timely raised. *Omer*, 395 F.3d at 1088; *United States v. Velasco-Medina*, 305 F.3d 839, 846-47 (9th Cir. 2002); *United States v. Du Bo*, 186 F.3d 1177, 1179-81 (9th Cir. 1999).

It is well-established that "if properly challenged prior to trial, an indictment's complete failure to recite an essential element of the charged offense is not a minor or technical flaw subject to harmless error analysis, but a fatal flaw requiring dismissal of the indictment." *Omer*, 395 F.3d at 1088 (trial court wrongfully denied defendant's pre-trial motion to dismiss based on indictment's failure to allege materiality). Similarly, in *Du Bo*, the Ninth Circuit reversed a defendant's conviction because the indictment was "fatally flawed" for failing to allege the necessary *mens rea*. *Du Bo*, 180 F.3d at 1179. The court in *Du Bo* held the failure to properly allege the elements of the offense "constitutes a fatal defect that cannot be cured through jury instructions, because a 'completely missing essential element' leaves 'nothing for the petit jury to ratify." *Id.* "Failing to enforce this requirement would allow a court to 'guess as to what was in the minds of the grand jury at the time they returned the indictment . . . .'" *Id.* (citation omitted).[4]

The Government cites *United States v. Fitzgerald*, 882 F.2d at 399, for the proposition that "an indictment which tracks the words of the statute charging the offense is legally sufficient so long as it sets forth unambiguously all elements to constitute the offense." (Response at 44.) The problem with this argument is that while the Indictment tracks a portion of the "statute," it does not track the entire statute. *See United States v. Pickett*, 353 F.3d 62, 66 (D.C. Cir. 2004) (overturning conviction where indictment did not allege all elements of offense because it tracked only a portion of statute).

In *Pickett*, the government attempted to charge an offense under 18 U.S.C. § 1001 (a) (2), for making a false statement in a matter within the jurisdiction of the legislative branch of the government

---

[4] In *Velasco-Medina*, the court limited the remedy of automatic dismissal to cases where, as here, the defect in the indictment is raised pretrial. *Velasco-Medina*, 305 F.3d at 846. "Untimely challenges to the sufficiency of an indictment [raised for the first time on appeal] are reviewed under a more liberal standard," that of plain error. *Id.* Thus, instead of automatic dismissal, the court asks whether "an error or omission in an indictment worked to the prejudice of the accused." *Id.* at 847. Because Defendants move to dismiss pretrial, they need not show prejudice. *Du Bo*, 186 F.3d at 1179.

1  of the United States.[5] 353 F.3d at 66. Pickett challenged the indictment, arguing the indictment's
2  allegation that the false statement was "within the jurisdiction of the legislative branch" was
3  insufficient because it failed to allege the charged conduct fell within the specifications of 18 U.S.C.
4  § 1001, subsections (c) (1) or (2), which require that the statement be made during administrative
5  matters or an investigation or review of Congress.[6] *Id.* The government argued that the indictment
6  was sufficient because it tracked the language of the statute, and that the subsections in question were
7  not "elemental." *Id.* The government apparently argued the subsections merely defined categories of
8  statements that were within the jurisdiction of the legislative branch. The court disagreed, noting that:
9  "an indictment that charges a false statement made in a mater within the jurisdiction of [the legislative]
10 branch without alleging that it was within one of the statutory categories has not charged an offense."
11 *Id.* The court also recognized the general proposition – as argued by the government – that "federal
12 laws usually list all offense elements in a single sentence," but pointed out that Section 1001 was an
13 exception to the general rule. *Id*. at 67-68 (concluding the "requirements of § 1001 (c) are elements"
14 of the offense). Because the indictment omitted language "*essential to the definition of the offense*,"
15 the court dismissed the indictment. *Id.* at 67 (emphasis added).

16    The *Fitzgerald* case, cited by the Government, is also instructive. There, the statute at issue
17 involved "assault resulting in serious bodily injury" under 18 U.S.C. § 113 (f).[7] 882 F.2d at 399.
18 Fitzgerald argued the indictment was defective because it lacked factual allegations "defining" the

---

[5] 18 U.S.C. § 1001 (a) (2) provides: "(a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully – . . . (2) makes any materially false, fictitious, or fraudulent statement or representation . . . shall be fined under this title or imprisoned not more than 5 years, or both."

[6] 18 U.S.C. § 1001 (c) (1) & (2) provide: "(c) With respect to any matter within the jurisdiction of the legislative branch, subsection (a) shall apply only to – (1) administrative matters, including a claim for payment, a matter related to the procurement of property or services, personnel or employment practices, or support services, or a document required by law, rule, or regulation to be submitted to the Congress or any office or officer within the legislative branch; or (2) any investigation or review, conducted pursuant to the authority of any committee, subcommittee, commission or office of the Congress . . . ."

[7] 18 U.S.C. § 113 (f), states: "Whoever, within the special maritime jurisdiction and territorial jurisdiction of the United States, is guilty of an assault shall be punished as follows: . . . (f) Assault resulting in serious bodily injury, by fine of not more than $10,000 or imprisonment of not more than 10 years, or both."

1 element of serious bodily injury. *Id.* The court disagreed, holding the indictment was sufficient
2 because it tracked the statute, alleging "the date, location and victim of the offense, and it specifically
3 charge[d] that the assault perpetrated by Fitzgerald directly resulted in the serious bodily injury of the
4 named victim." 882 F.2d at 399. The court further held that the element of serious bodily injury is
5 a "common sense" determination for the jury to decide. *Id.* n. 2. In other words, simply alleging
6 "serious bodily injury" is sufficient because the term is readily understood in its ordinary sense. It
7 need not be further defined.

8 In contrast, RACM is a term of art defined in a dense regulatory scheme. The elements of
9 RACM (and the work practice standards) emerge only by an expedition through the Clean Air Act and
10 the NESHAP regulatory scheme, and a cobbling together of relevant regulatory provisions. To allow
11 an indictment to stand that simply declares the material to be "RACM," without alleging the elements
12 "essential to the definition of [an] offense" based on RACM, *Pickett*, 353 F.3d at 67, and the facts and
13 circumstances supporting such a conclusion, would be contrary to *Du Bo*: "Failing to enforce this
14 requirement would allow a court to 'guess as to what was in the minds of the grand jury at the time
15 they returned the indictment.'"[8] 180 F.3 at 1179.

16 **IV.**

17 **CONCLUSION**

18 For these reasons, the Court dismisses without prejudice Counts 1, 2, 3 and 5 of the Indictment
19 for failure to set forth unambiguously all elements of the charged offenses. All dates as to Defendants
20 Kyle Rheubottom and Jacquelyn Mc Hugh are vacated, as all counts against these Defendants are
21 dismissed.

22 **IT IS SO ORDERED.**

23 DATED: November 21, 2006

25 HON. DANA M. SABRAW
United States District Judge

---

27 [8] While it is undisputed the Government did not present evidence to the grand jury concerning the first element of RACM – more than 1% asbestos as determined by the test method specified in the 1990 NESHAP – it is unclear what was presented to the grand jury regarding the second element of RACM, *i.e.,* the nature of ACM.