1
2
3
4
5
6
7                    **UNITED STATES DISTRICT COURT**
8                 **SOUTHERN DISTRICT OF CALIFORNIA**
9

10   UNITED STATES OF AMERICA,               CASE NO. 06cr0065 DMS
                                                      07cr0484 DMS
11

12                          Plaintiff,       **ORDER GRANTING
                                             DEFENDANTS' MOTION FOR
13        vs.                                NEW TRIAL**

14                                           [Docs. 157, 158, 159, 161, 163, 184]
15

16   SAN DIEGO GAS & ELECTRIC
     COMPANY, et al.,
17

18                          Defendants.
19

20        On August 22, 2007, Defendants San Diego Gas and Electric Company ("SDG&E"), Kyle

21   Rheubottom, and David Joseph Williamson filed motions for acquittal and, in the alternative, for new

22   trial under Rules 29 and 33 of the Federal Rules of Criminal Procedure.  The motions were fully

23   briefed by the parties, and argued on September 26, 2007.  On October 4, 2007, the parties submitted

24   supplemental briefing at the request of the Court regarding the admissibility of certain samples of

25   asbestos containing materials and the test methodology employed to determine the asbestos content

26   of those samples.

27        Defendants advanced numerous grounds in support of their motions.  Two grounds merit relief.

28   The admission of scientific test results regarding the asbestos content of certain samples of pipe wrap,

1  combined with the manner in which such results were argued to the jury, warrants a new trial as to all

2  Defendants on the asbestos NESHAP (National Emission Standards for Hazardous Air Pollutants)

3  work practices counts.  Additionally, the inconsistent verdicts on the false statement count warrant a

4  new trial as to Defendant SDG&E on that count.  The balance of Defendants' arguments are denied.

5  **I.**

6  **BACKGROUND**

7  The facts are well known to the parties and thus, only facts relevant to the issues addressed in

8  this Order are set forth below.  Defendants SDG&E, Kyle Rheubottom, David Joseph Williamson, and

9  Jacquelyn McHugh were among the first persons in the nation to be charged with criminal violations

10  of asbestos NESHAP work practice standards promulgated by the Environmental Protection Agency

11  ("EPA").  The Government alleged Defendants violated certain NESHAP work practice standards

12  during the removal of over nine miles of asbestos-containing gas pipeline.  The Government's case-in-

13  chief included five counts: three work practices counts, one false statement count, and one conspiracy

14  count.  After the Government rested, the Court granted Defendants' Rule 29 motion and dismissed the

15  conspiracy count as to all Defendants.  The counts in the indictment were thereafter renumbered, and

16  the jury was charged with deciding the remaining four counts.

17  Counts one through three charged Defendants with various violations of the asbestos NESHAP

18  work practice standards, including failure to provide written notice of the removal of "regulated

19  asbestos containing material" ("RACM") in advance of the start date of the renovation operation

20  (count one), failure to adequately wet RACM (count two), and failure to contain RACM in leak tight

21  containers (count three).  The fourth count charged Defendants SDG&E and Williamson with making

22  a false statement to federal authorities under 18 U.S.C. § 1001.

23  After a lengthy trial involving numerous novel issues of law, a jury found Defendant SDG&E

24  guilty on all counts, and Defendants Rheubottom and Williamson guilty on count three (failure to

25  contain RACM in leak tight containers).  Defendants Rheubottom and Williamson were acquitted of

26  the remaining work practices counts.  The jury deadlocked as to Defendant Williamson on the false

27  statement count, and Defendant McHugh was acquitted of the one work practice count with which she

28  was charged: failure to provide written notice (count one).

The regulatory scheme promulgated by the EPA subjects the removal of certain "asbestos containing materials," or "ACM," to environmental oversight and regulation.  Not all materials containing asbestos, and not all demolition projects, are regulated.  To be "regulated," the material and project must exceed certain thresholds regarding project size and asbestos content.  Pertinent to the present motion are the following requirements: (1) the quantity of asbestos content in the ACM must exceed 1% as determined by a designated test method (40 C.F.R. § 61.141); and (2) the ACM must be "friable," that is, the material may be crumbled by hand pressure creating dust, or if initially "nonfriable," the ACM must have a "high probability" of becoming friable due to acts of disturbance during the removal process.  (*Id.*)  If the ACM meets these and other standards not relevant here, it is deemed to be regulated asbestos containing material, or RACM, and subject to governmental oversight and regulation through the NESHAP work practices standards.  Accordingly, as a threshold to criminal culpability, the Government must prove that  the material under investigation is RACM, *i.e.*, contains more than 1% asbestos and is friable or has a high probability of becoming friable.  The cental issue here is whether the Government properly proved that the pipe wrap in question contained more than 1% asbestos.[1]

To prove the pipe wrap contained more than 1% asbestos, the Government presented eighteen samples of pipe wrap to the jury.  Each sample was analyzed by a laboratory, and each laboratory was represented by a witness who testified before the jury about the test procedure used by the lab to determine asbestos content.  All but five of the samples were destroyed after testing.  Defendants' labs tested the five existing samples ("SD-1, 2, 3, 4 & 5"), and Defendants presented their own evidence reporting the results of those tests.

Throughout the litigation, both the test procedures used to determine asbestos content and the

---

[1]  The work practice counts share four common elements in this prosecution: (1) "defendant is a person who was an owner or operator of a renovation operation involving at least 260 linear feet of regulated asbestos containing material on pipes;" (2) "the asbestos containing material contained over 1% asbestos as determined using the method specified in Appendix E, subpart E, 40 C.F.R. part 763, Section 1, Polarized Light Microscopy;" (3) "the asbestos containing material involved in the renovation operation was regulated asbestos containing material, that is friable asbestos containing material, or Category II nonfriable asbestos containing material that has a high probability of becoming or has become crumbled, pulverized, or reduced to powder by the forces expected to act on the material in the course of renovation operations;" and (4) "defendant acted with knowledge that the renovation operation involved the removal of asbestos."  It is the second element that is at issue here.

1   nature of the samples tested were the subject of intense debate.  These disputes, which were novel and

2   highly technical, were the subject of several pre-trial orders issued by the Court.  In its first order, the

3   Court held that where discrete layers of ACM are identified, each layer must be analyzed for asbestos

4   content, and the results must then be combined to determine "an estimate of asbestos content for the

5   whole sample."[2]  (Order, November 21, 2006, Doc. 178, Case No. 06-cr-0065, "RACM I Order").

6   This test method has been referred to by the Court throughout this litigation as the "averaging test."

7           The Government initially charged and indicted Defendants with work practices violations

8   based upon a different test, one in which only a single layer was tested for asbestos content.  Using the

9   "single layer" test method, the Government determined asbestos content by testing only the layer of

10  pipe wrap that contained asbestos (and ignoring other non-asbestos containing layers).  The Court held

11  the single layer test method was not subject to rulemaking procedures as mandated by the

12  Administrative Procedures Act and thus, the test could not be used in place of the averaging test.[3]

13  (RACM I Order at 12).  Because the Government relied upon single layer testing to indict Defendants,

14  in the RACM I Order, the Court dismissed the work practices counts.  Thereafter, the Government re-

15  indicted Defendants in accordance with the RACM I Order.

16          Defendants moved to dismiss the second indictment on numerous grounds, all of which were

17  denied by the Court.  Significantly, however, the parties briefed whether a sample of ACM had to be

18  "whole" (*i.e.,* contain all layers of the pipe wrap) in order to be used as a sample from which asbestos

19  content could be determined.  On March 29, 2007, at a hearing on Defendant's motion to dismiss, the

20  Court ruled from the bench and held that while the NESHAP regulations do not require an intact

21  sample, they do require a *whole* sample– that is, the sample must contain *all* layers of the material.

22  (Order, March 29, 2007, RT 39:6-13; 44:25-45:3, "RACM 1.5 Order")  Finally, on April 12, 2007, the

23  Court determined that once layers are separated from a sample, the asbestos content of each layer is

24  measured and averaged by volume rather than by weight – a test method referred to in this litigation

25

26          [2]  40 C.F.R. Pt. 763, Subpt. E, § 1.7.2.1, provides in pertinent part: "When discrete strata are
     identified, each is treated as a separate material so that fibers are first identified and quantified in that
27  layer only, and then the results for each layer are combined to yield an estimate of asbestos content for
     the whole sample."

28          [3]  The parties did not brief and the RACM I Order did not address which test method would
     apply if a sample did *not* contain discrete identifiable layers.

as "volumetric averaging." (Order, April 12, 2007, Doc. 20, Case No. 07-cr-0484, "RACM II Order"). The RACM II Order reiterated that volumetric averaging may be "properly performed by analyzing a complete, albeit non intact sample of the asbestos material." (*Id.* at 1). Again, however, the parties did not brief and the Court did not decide what test would apply if a sample did *not* contain discrete, identifiable layers.

During trial, Defendants moved to exclude most of the Government's scientific evidence on grounds that it conformed with neither the NESHAP regulations nor the Court's RACM Orders. The Government represented the tests were compliant with the pretrial orders.[4]  The Court ultimately concluded that its pretrial orders were clear, and any non-compliance by the laboratories would go to the weight rather than the admissibility of the evidence in question. The Court was satisfied that any nonconformity would be revealed during cross examination and the evidence – given its probative value – was not sufficiently confusing or prejudicial to warrant exclusion. (RT 432:14-18). On these grounds, the Court allowed the Government to present the evidence. (RT 447:9-12).

## II.

## LEGAL STANDARD

The Court may grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33. In practice, a new trial is a remedy that courts grant sparingly. *See, e.g., United States v. Narciso,* 446 F. Supp. 252 (E.D. Mich. 1976); *United States v. Snead*, 447 F. Supp. 1321 (E.D. Pa. 1978). The Court may grant a new trial only if the error was not harmless under the same standard an appellate court would apply under Rule 52 of the Federal Rules of Criminal Procedure. *See* Fed. R. Crim. P. 52 advisory committee's note. However, unlike a motion for acquittal, the Court need not draw all inferences in favor of the Government. "If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." *United States v. Kellington*, 217 F.3d

---

[4]  Counsel for the Government stated, "[t]he witnesses will tell you that they followed the test method in the regulations with the sample that they had." (RT 221:20-22). The Government made no representations at that time as to the representativeness of the sample, *i.e.,* whether the samples were "whole" in accordance with the RACM 1.5 Order.

1    1084, 1097 (9th Cir. 2000).

2    **III.**

3    **DISCUSSION**

4    **A.    The NESHAP and the Court's Pretrial Orders.**

5    The NESHAP regulations describe the process for collecting and analyzing ACM to determine

6    asbestos content.  More specifically, the Court's RACM Orders describe the type of sample required

7    for testing, and the test method for determining asbestos content where discrete strata are identified.

8    These matters are discussed in more detail below.

9    *1.    Step One: Sampling*

10   As discussed, the Court in its pretrial orders held that a "complete" sample must be used to

11   determine asbestos content under the averaging test.  (*See, e.g.,* RACM II Order at 1 (averaging test

12   specified in Section 1.7.2.1 is properly performed "by analyzing a complete" sample of ACM)).  After

13   trial, Defendants refined their arguments on this issue.

14   Defendants now focus on Section 1.7.1 of the regulations, which provides in pertinent part,

15   "[s]amples for analysis of asbestos content shall be taken in the manner prescribed in Reference 5. .

16   . . If there are any questions about the representative nature of the sample, another sample should be

17   requested before proceeding with the analysis." Reference 5 is a document entitled "Asbestos-

18   Containing Materials in School Buildings: A Guidance Document." ("Guidance Document").  Under

19   the heading "How to Take a Sample," the Guidance Document states, "a representative sample should

20   be taken from within the material itself by *penetrating the depth of the material* with a sample

21   container." (Guidance Document at 9) (emphasis added).  It further emphasizes, "be sure to *penetrate*

22   any paint or protective coating and *all the layers of the material*." (*Id.* at 10) (emphasis added).  While

23   this precise argument was not advanced pretrial by Defendants, it is entirely consistent with the Court's

24   pretrial orders, with one significant difference: the sampling requirements set forth in Section 1.7.1

25   are not limited to the volumetric averaging test, but rather apply to all samples tested under any test

26   methodology.  The Court's RACM Orders, in response to the parties' briefings and arguments, focused

27   only on proper sampling methods for testing by volumetric averaging.

28   The Government advances four principal arguments that a "representative" sample as described

1   by Section 1.7.1 (and apparently a "whole" or "complete" sample as described in the RACM 1.5

2   Order) is not required.  These arguments lack merit for the following reasons.

3   First, the Government argues the phrase "representative sample" as used in the EPA regulations

4   refers only to a representative sample of the pipe wrap that an inspector was actually provided,

5   regardless of whether the sample is representative of the pipe wrap as it existed on the pipe.  (Oral Arg.

6   at 9, 19-21).  The Government argues that were it otherwise, a sophisticated defendant that managed

7   to clean up most of the ACM could make it impossible for the EPA to find a representative sample of

8   the type described in the Guidance Document, and thus hamper the Government's ability to prosecute.

9   Inspectors, according to the Government, should therefore be able to sample and test whatever material

10  they find, regardless of whether it is a representative sample.

11  The regulations, however, clearly require a representative sample of ACM, not simply a sample

12  representative of whatever material inspectors happen to find.  Case law is consistent: "samples are

13  receivable in evidence to show the quality or condition of the entire lot or mass from which they are

14  taken.  The prerequisites necessary to the admission in evidence of samples are that the mass should

15  be substantially uniform with reference to the quality in question and that the sample portion should

16  be of such a nature as to be fairly representative." *Rite Fabrics, Inc. v. Stafford-Higgins Co.,* 366 F.

17  Supp. 1, 11 (S.D.N.Y. 1973) *quoting E.K. Hardison Seed Co. v. Jones*, 149 F.2d 252, 256 (6th Cir.

18  1945).  *See also Otoe Co. Bank v. Delany,* 88 F.2d 238 (8th Cir. 1937); *Leonard v. Uniroyal, Inc.,* 765

19  F.2d 560, 567 (6th Cir. 1985); *Lapwai v. Alligier*, 69 Idaho 397 (1949).  In other words, if a sample

20  is only representative of what inspectors encounter, it tells the fact finder nothing about the

21  composition of the material as a whole, or, in this case, the pipe wrap on the pipe.

22  Further, the Government's argument that obtaining representative samples of the type required

23  by the regulation could be difficult and sometimes impossible, thereby precluding prosecution, is

24  purely theoretical.  The Government not only could have collected representative samples from over

25  nine miles of pipe wrap on the pipe, it did in fact collect such samples.  The parties agree, for example,

26  that SD-2 is a representative (or whole) sample of pipe wrap.  In addition, even if regulatory authorities

27  are precluded from obtaining a representative sample due to illicit cover-up efforts of an owner or

28  operator of a renovation or demolition operation, otherwise inadmissible evidence does not become

1  admissible on that basis alone.

2       Second, the Government argues the sampling methods set forth in the Guidance Document are

3  intended for self-evaluation purposes, and are not required for compliance or admissibility in a

4  criminal prosecution.  (Oral Arg. at 5-6).  Adopting this interpretation would subject owners and

5  operators of demolition and renovation projects to arbitrary prosecution.  If the Government is not

6  required to test samples that are representative of the suspected ACM, a party's guilt or innocence

7  would depend entirely upon the sample collected, no matter how contaminated or unrepresentative.

8  The Government's proposed rule would permit the following situation: a company tests ACM using

9  a representative sample, finds it is not RACM, and on that information, properly concludes there is

10  no obligation to comply with the NESHAP requirements.  Later, after demolition or renovation

11  activities begin, the regulatory authorities retrieve and test bits and pieces from the project that may

12  not be representative or whole samples.  If such samples reveal high concentrations of asbestos, the

13  company would be subject to criminal prosecution for asbestos NESHAP violations even when the

14  ACM, based upon a representative sample, is not RACM.  Such a result would violate basic principles

15  of due process, which "require[] legislatures to set reasonably clear guidelines for law enforcement

16  officials and triers of fact in order to prevent arbitrary and discriminatory enforcement" of the law.

17  *Smith v. Goguen*, 415 U.S. 566, 572-73 (1974).[5]

18       Third, the Government argues it understood the phrase "whole sample" as used by the Court

19  in its RACM 1.5 Order to require that the whole sample *collected* be tested in its entirety, not, as

20  Defendants argue, that the sample *itself* be a whole or representative section of pipe wrap.  (Oral Arg.

21  at 11).  This argument is contrary to the record.  At the RACM 1.5 hearing, the parties debated whether

22  the sample tested had to be whole *and* intact.  The Court held the regulations required a whole but not

23  necessarily intact sample.  The Court inquired of the Government whether it had any whole samples,

24

25      [5] The Government alluded to a related argument during oral argument that test methods may differ between criminal and civil enforcement matters.  (Oral Arg. at 95).  In support, the Government cited the Ninth Circuit's recent decision in *United States v. W.R.Grace*, ___ F.3d ___, 2007 WL

26  2728767 (9th Cir. 2007), in which the court acknowledged there could be two definitions of the same term depending upon the (civil or criminal) forum of enforcement.  (*Id.* at *17).  However, in *W.R.*

27  *Grace*, the court noted the source of each definition.  In the present case, the Government has not cited any authority for the proposition that different testing standards may apply to civil and criminal

28  enforcement cases.  Moreover, the Government has not identified any authority permitting the testing of non-representative samples.

1   *i.e.*, samples that "contained all the layers, albeit not intact." (RT 12:23-24).  The Government

2   responded, "SD-2 does contain all of the layers of the material." (RT 13:10-11).  Clearly, it was

3   understood by the parties that a "whole sample" meant an all-layers sample.

4         Fourth, the Government argues the sampling procedure outlined in the Guidance Document

5   only applies to the sampling of "friable" material, so if material is non-friable on the pipe, no

6   representative samples must be collected. (Gov. Supp. Brief at 5).  The regulation itself belies this

7   argument. Section 1.7.1 mandates that a representative sample of "asbestos" be taken, without limiting

8   such sampling to friable material.  Indeed, such a limitation would make no sense.  The sampling

9   method is designed to ensure accurate testing of the composition of the whole material, which does

10  not depend upon a determination of friability.  It would be incongruous to require two different

11  procedures for friable and non-friable asbestos.  Moreover, the Government consistently has

12  maintained that the ACM in this case, that is, the pipe wrap both on the pipe and after being stripped

13  from the pipe, is friable.  *See, e.g.,* Govt's Supp. Briefing at 5: 6-7, n.3 (noting "vast majority" of

14  material in this case was friable, as were many samples taken from the pipe).

15        Accordingly, in order to establish threshold quantities of asbestos (1% or more) to support a

16  finding of RACM and criminal prosecution, the Government must base its showing upon a

17  representative sample.  If a sample is not representative, it is inadmissible for purposes of proving

18  asbestos content of the ACM (pipe wrap) as a whole.  The determination that a representative sample

19  is a foundational prerequisite to admitting test results significantly impacts this case, as many non-

20  representative samples were admitted into evidence and considered by the jury.

21        *2.    Step Two: Testing*

22        Once a representative sample is collected, it must be tested by a sanctioned laboratory in

23  accordance with the NESHAP regulations.[6]  In addition to collecting a representative sample under

24  Section 1.7.1, the regulations set forth a number of steps to testing, including but not limited to,

25  averaging when discrete strata are identified (1.7.2.1), sample preparation (1.7.2.2), fiber identification

---

27      [6]  All analysts testified they had no personal knowledge of the collection or sampling
    procedures; they simply analyzed what they were given without knowing whether the sample was
28  representative or not.  The Government argues that for this reason, the Court should examine only the
    testing procedure and ignore the representative sampling step.  The limited personal knowledge of the
    analyst, however, has no bearing on whether the sample is or ought to be representative.

1  (1.7.2.3), and quantification (1.7.2.4).

2         In simple terms, after a sample is prepared and fibers are identified, the fibers must be

3  quantified.  The proper method of quantification depends upon whether discrete layers are found

4  during the sample preparation step.  If discrete layers are not identified, the Government argues the

5  quantity of asbestos in a homogenized sample or representative sub-sample ("pinch mounts")

6  represents the quantity of asbestos in the entire sample, and the analysis is complete.  This method of

7  testing was not briefed by the parties, and the Court did not determine whether any of the samples

8  complied with these test procedures.[7]  Conversely, as discussed, where discrete strata are identified,

9  volumetric averaging is employed.  (Section 1.7.1.1).

10        **B.     The Government's Samples.**

11        Of the eighteen samples offered by the Government and admitted in evidence, twelve are

12  described by both parties as "debris" or "waste" collected from the CRC Evans stripping machine and

13  nearby dumpsters.  ("Debris Samples").  The Debris Samples are not representative.

14        The Government argues the "homogenous debris from the end of the process line" was

15  representative, since it contained all material that used to be on the pipe.  (Gov. Supp. Brief at 5).  This

16  argument is without merit, as truly homogenized materials are blended into a uniform mixture.  All

17  components of the mixture are uniformly distributed throughout, ensuring that any given sample

18  contains materials present in the same proportion as any other sample.  If the pipe-stripping machine

19  in fact homogenized all layers of the pipe wrap, the Government would be correct in asserting that any

20  sample collected was representative.  However, the Government presented no evidence that the

21  material at the end of the process line was truly homogenous.  While Penny Weir of the APCD

22  described a "homogeneous" section of debris that included "crumbled, pulverized, and the powder

23  [material]," (RT 498:13-17), this testimony does not demonstrate the material is homogeneous.

24  Instead, Weir necessarily observed and collected debris in a variety of forms, all of which were broken

25  down in varying degrees.  The heterogeneous nature of the mixture likely resulted in the collection of

26  non-representative samples.  The Government acknowledged, for example, that as to debris in the

27  dumpsters, "you could never know whether you had samples that were representative of all layers."

28

———————————————————

[7] The propriety of homogenization or pinch mounting is not addressed in this Order.

(Oral Arg. at 7).  Because the debris in the dumpsters came from the stripping operation, the same uncertainty would apply to the debris found near the stripping machine.  Under these circumstances, the Government did not establish that these samples are representative.  This leaves six samples, not collected from debris, that may be representative.

### 1. 1998 Keithly Sample

The first is a sample taken by Robert Keithly of SDG&E in 1998 ("Keithly Sample").  That sample was tested by Design For Health, on whose behalf Kabir Shefa testified.  Shefa found the asbestos content of that sample to be 50-60%. (Ex. 166).  The parties dispute whether the sample was representative.  The Government presented Keithly's testimony that he created a work order for sampling, (RT 2798:12-2805:20), which instructed the worker to "remove a six-inch square of pipe wrap for submittal to [the] lab." (RT 2804:11-13).  The work order was admitted into evidence as Exhibit 374.  Keithly testified, "when you normally talk about pipe wrap, pipe wrap goes down to the pipe itself." (RT 2828:23-2829:3).  The person who collected the sample did not testify.  Keithly also testified that the sample was "about an eighth to a quarter of an inch thick," which is much thinner than the FBI's minimum estimation of the thickness of the pipe wrap.  (RT 2831:14-16).

The parties also dispute whether the sample was properly tested.  The Government concedes Shefa "did not . . . average the results to obtain overall asbestos percentage, . . . so such results would not comport with the PLM method, as defined by this court in its previous rulings." (*See* Govt's Supp. Brief at 6).  Instead, the Government argues that while the Keithly Sample contained all layers, no "discrete strata" were identified, and thus a "straightforward PLM analysis" was performed.[8] (*Id.* at 7).  Defendants contend Shefa engaged in improper single layer testing, resulting in a wildly high estimation of 50-60% asbestos.  (*See* Defts' Supp. Brief, Attachment "A," No. 1).

### 2. 1999 Ninyo & Moore Samples

The second and third potentially compliant samples were collected by Ninyo & Moore in 1999, and also were analyzed by Shefa of Design for Health.  According to Shefa, the asbestos content of the first Ninyo & Moore Sample was between 40-50%, and the asbestos content of the second sample

---

[8] The Government argues Shefa took "pinch mounts" in compliance with the regulations. (Supp. Brief at 1).  However, Shefa never mentioned "pinch mounting," taking a "representative sub-sample," or homogenizing the material.

1  was between 5-10%. (Ex. 167). Defendants concede that both samples are representative, but argue

2  the test methodology was incorrect. The testimony the Government cites in support of its test on these

3  samples is the same as that provided for the Keithly Sample. (Gov. Supp. Brief at 2). As with the

4  Keithly Sample, Defendants argue Shefa engaged in improper single layer testing, resulting in erratic

5  and inflammatory results.

6      *3. 2003 JMR Sample*

7      The fourth sample was collected by an unknown person during a January 23, 2001, EPA

8  inspection. ("JMR Sample") It was tested by JMR Environmental Services, on whose behalf Jill

9  Brodwolf testified. The report indicates the sample contained 5% asbestos. (Ex. 57). The parties

10  disagree about whether the sample was representative and whether the test methods were correct. The

11  Government presented no evidence that the sample was representative. The only person who testified

12  about the nature of the sample was Brodwolf; however, she did not testify about the collection process.

13  She testified by referencing a chain of custody form, which indicated that Defendant Williamson gave

14  her the sample, and that it came from a pipe. (RT 3010:5-7; 3011:6-8). From that testimony, the

15  Government asks the Court to infer that the sample was representative because "it was taken on behalf

16  of the defendants, who had every interest in obtaining a sample of all layers." (Gov. Supp. Brief at 7,

17  n.4). Defendants dispute the Government established that the sample is representative, and dispute

18  the Government's test methodology – arguing Brodwolf performed a "calibrated visual estimation"

19  that is neither compliant with the regulations nor the Court's pretrial orders. The Government

20  contends Brodwolf conducted an averaging test consistent with Section 1.7.2.1.[9]

21      *4. 2001 EPA Sample – "SD-1"*

22      The fifth sample was collected by Bob Trotter of the EPA on January 23, 2001, from a

23  damaged portion of pipe. ("SD-1"). It was tested by Peggy Forney of the NEIC laboratory for the

24  Government, and by Dan Van Orden of the RJ Lee Group for the defense. Because the pipe was

25  damaged, Defendants argue it cannot be determined whether the sample is representative. The

26  Government has shown some hesitation on this point. When asked whether the Government had any

27  _____

28      [9] Brodwolf, however, testified she analyzed each layer separately, (RT 3016:5-7), but averaged asbestos content in only asbestos-containing layers. She also did not perform "point counting" as required by the EPA regulations when the results showed less than 10%. (RT 3016:23-24).

1   whole samples, counsel replied, "SD-2 contains all of the layers, albeit not intact.  SD-1 may contain

2   all of the layers.  That is less certain because SD-1 and SD-2 are both samples taken from the same

3   pipe, maybe 5 or 10 feet apart.  The SD-1 sample was taken from an area where the top layer was

4   disturbed.  It had been like ripped, whatever, so it is unclear whether the SD-1 sample contains each

5   and every layer."  (RACM 1.5 Order, RT 12:25-13:6).

6          The Government's report indicates the asbestos content of SD-1 is between 2.43-3.46%.  (Ex.

7   389).  Defendants' report indicates the asbestos content is at or below 1%.  (Ex. 5001, 6054, 6066,

8   6067).  The parties agree the sample was tested in compliance with the NESHAP regulations and the

9   Court's RACM Orders by both laboratories.

10         *5.  2001 EPA Sample – "SD-2"*

11         The sixth sample was collected by Bob Trotter on January 23, 2001, from a pipe in good

12  condition ("SD-2").  It was tested by NEIC and the RJ Lee Group.  The parties agree that the sample

13  is representative, and that it was tested pursuant the NESHAP regulations and the Court's pretrial

14  orders.

15         **C.     Admissibility of Non-Representative Samples and Test Methodologies other than
                    Volumetric Averaging.**

16

17         The Court proceeded under the assumption that the focus of argument to the jury regarding the

18  asbestos content element would center on SD-2, as that was the sample the parties had agreed

19  contained all layers and was tested pursuant to the volumetric averaging method discussed in the

20  pretrial orders.  Indeed, much of the evidence at trial regarding asbestos content of the pipe wrap

21  centered on SD-2.  This sample was collected by the EPA and re-tested by the NEIC to comply with

22  the RACM I Order and volumetric averaging.[10]  Numerous expert witnesses testified on the subject,

23  including Peggy Forney of the NEIC, Dan Van Orden of RJ Lee Group, and other experts in fields

24  involving photogrammetry, image analysis, materials science, environmental forensics, and

25  environmental science.  The parameters of volumetric averaging as to SD-2 (and closely related

26  samples like SD-1), were, in the Court's mind, sufficiently defined in the pretrial orders.  No additional

27

28         [10]  SD-1, SD-2, and three Debris Samples (SD-3, 4 & 5) were all collected by Trotter of the
           EPA and later re-tested under the averaging test.

1   instruction on the issue seemed necessary as: (1) the Court already had determined the averaging test

2   method applied, (2) extensive evidence was presented at trial on volumetric averaging and SD-2, and

3   (3) the jury was instructed on the elements of the work practices counts, including the requirement that

4   the Government prove asbestos content by "using the method" specified in the regulations.  The only

5   "method" briefed by the parties and discussed in the pretrial orders was volumetric averaging.

6        Under these circumstances, the Court believed the other samples were admissible as being

7   generally relevant on the issue of asbestos content, yet not unduly confusing or prejudicial as such

8   samples could be distinguished from the representative sample(s) that were tested under the averaging

9   method.  The Court anticipated the defense would distinguish non-representative samples on grounds

10  that while such samples show the presence of asbestos, the samples were of limited relevance because

11  they either were not subjected to volumetric averaging or were not representative of the actual

12  composition of the pipe wrap.  Likewise, the Court anticipated the Government would center its

13  arguments regarding asbestos content around representative samples tested pursuant to volumetric

14  averaging.

15       Several issues have taken prominence in the post-trial briefing that were well in the

16  background, if nonexistent, at trial.  These issues include: One, whether a "representative sample" as

17  defined in Section 1.7.1 and the Guidance Document is required before the sample may be admitted

18  for purposes of establishing asbestos content?  Two, if discrete strata are not identified in a

19  representative sample such that volumetric averaging cannot be performed, may the Government rely

20  on other test methodologies for determining asbestos content?  Three, if so, what test method(s)?

21  These issues were not addressed (or were not sufficiently addressed) at trial, and, given the arguments

22  that developed at trial, should have been.

23       Having determined that all twelve of the Debris Samples are not representative, two of the six

24  samples taken from the pipe may not have been representative (*e.g.*, the Keithly and JMR Samples),

25  and four of the six samples from the pipe may not have been tested using a permissible method (*e.g.*,

26  Keithly, Ninyo & Moore, and JMR Samples), the question becomes whether the admission of these

27  samples and attendant results was error of a magnitude warranting a new trial.  Based on these

28  samples, the jury heard evidence that the asbestos content of the pipe wrap ranged from 1.55% to 60%.

1    *See, e.g.*, 1998 Keithly Sample – 50-60% (Ex. 166); 1999 Ninyo & Moore Samples – 40-50% (Ex.

2    167); Debris Sample – 57% (Ex. 23); Debris Sample – 10% (Ex. 25); Debris Sample – 11% (Ex. 26);

3    Debris Sample – 10% (Ex. 27); Debris Sample – 8% (Exs. 46-47).  The Government presented the

4    evidence for the express purpose of proving an element of the case, *i.e.*, that the pipe wrap contained

5    more than 1% asbestos.[11]  The admission of the test results from these samples was confusing,

6    misleading and prejudicial.

7       As for the Debris Samples, the analysts necessarily did not test the entire material in its proper

8    proportion.  The reported results therefore proved nothing about the actual composition of the pipe

9    wrap, regardless of the test method used.  Yet, the Government urged the jury to consider all of the

10    reports when determining whether the asbestos content exceeded 1%.  In closing argument, the

11    Government argued, "[b]ut even if you don't accept Peggy Forney's [SD-1 and SD-2] results– even

12    if you don't accept them at all, you've heard testimony from three other laboratory analysts who

13    analyzed the pipe wrap material from Encanto . . . and all of them, every last one, found it to be greater

14    than one percent asbestos."  (RT 4917:21-25).

15       While the test results from non-representative samples are relevant to whether the pipe wrap

16    is *friable*, their probative value on the issue of whether the pipe wrap contained more than 1% asbestos

17    was –with the benefit of hindsight – substantially outweighed by undue prejudice and confusion of

18    issues.  This is particularly so given the highly technical and scientific nature of the testimony.  It is

19    axiomatic that expert testimony can be "quite misleading because of the difficulty in evaluating it."

20    *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 595 (1993) (citation omitted).  Therefore, courts "in

21    weighing possible prejudice against probative force under Rule 403 . . . exercise[] more control over

22    experts than over lay witnesses."  *Id.*  The Government presented the jury with eighteen samples, all

23    of which contained over 1% asbestos (some as high as 60%).  The evidence overwhelmingly indicated

24    that the pipe wrap contained more than 1% asbestos, despite strenuous Defense argument that nearly

25    all of the samples did not comply with the regulatory requirements.

26       In addition, given the Government's argument to the jury, the Keithly, Ninyo & Moore, and

27

28       [11] The evidence also was relevant for proving friability.  For that purpose, some of the samples may have been admissible but there would have been no need to reveal the quantity of asbestos.

       06cr0065 DMS

1   JMR Samples should have been addressed pretrial by the Court and parties to determine: (1) whether

2   the Keithly and JMR Samples were representative and therefore admissible, (2) assuming the JMR

3   Sample is representative, whether it was tested in accordance with volumetric averaging or another

4   NESHAP sanctioned test, and (3) assuming the Keithly Sample is representative, whether it and the

5   Ninyo & Moore Samples (which the parties concede are representative) were tested in accordance with

6   a NESHAP sanctioned test other than volumetric averaging.

7           The admission of both non-representative samples and samples tested under methods of

8   debatable validity, combined with the manner in which such results were argued to the jury, caused

9   unfair prejudice and confusion of issues.  Defendants presented substantial evidence regarding SD-2

10  (the only sample the Government demonstrated was representative), calling into question the accuracy

11  of the Government's volumetric averaging test results. Such evidence preponderated sufficiently

12  against the verdict that the Court is persuaded a serious miscarriage of justice occurred.  For these

13  reasons, the Court sets aside the convictions on the asbestos NESHAP counts, and grants a new trial.

14          **D.      The False Statement Count**

15          On count four, false statement under 18 U.S.C. § 1001, the jury was unable to reach a verdict

16  as to Defendant Williamson, but convicted Defendant SDG&E.  SDG&E, a corporation, could be

17  found guilty only through the acts of its agent.  *See NY Cent. & Hudson River R.R. Co. v. United*

18  *States*, 212 U.S. 481, 491-95 (1909).  Since Defendant Williamson was the sole employee whose

19  actions could be attributed to SDG&E on this count, the verdicts are plainly inconsistent.  *See, e.g.,*

20  *United States v. Hughes Aircraft Co.,* 20 F.3d 974, 978 n.6 (9th Cir. 1994).  If the jury could not

21  determine beyond a reasonable doubt that Williamson made a false statement, it also could not have

22  found beyond a reasonable doubt that SDG&E, acting through Williamson, made a false statement.

23          While the verdicts equally could be an indication of the jury's lenity toward Defendant

24  Williamson or of unfair prejudice to Defendant SDG&E, *see United States v. Dotterweich,* 320 U.S.

25  277 (1943), the Court is satisfied a new trial is warranted.  SDG&E could act only through its agent

26  Williamson, and the evidence as to Williamson was the sole evidence on this count.  The convictions

27  of SDG&E on *all* counts and the inconsistency of verdicts between the Defendants, suggest a

28  miscarriage of justice occurred and a new trial is warranted.

## III.

## CONCLUSION

For these reasons, Defendants' motion for new trial is GRANTED as to all Defendants on all counts on which they were convicted.  A status conference will be held on December 21, 2007, at 11:00 a.m., at which time future dates will be set.

**IT IS SO ORDERED.**

DATED:  December 7, 2007

_____
HON. DANA M. SABRAW
United States District Judge

06cr0065 DMS